PAUL ELKINS AND JUDITH ELKINS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 19384–82.     Filed September 28, 1983.

*Sidney Gelfand,* for the petitioners.

*Theodore J. Kletnick* and *Kendall C. Jones,* for the respondent.

## OPINION

FEATHERSTON, *Judge*: This case is before the Court on respondent's motion for reconsideration of an order, dated May 13, 1983, denying his motion for partial summary judgment pursuant to Rule 121.[1] The motion for partial summary judgment raised an issue as to whether the Commissioner properly applied the amended section 1.612–3(b)(3), Income Tax Regs., in disallowing a partnership loss deduction claimed by petitioner for 1976. Most of the partnership's loss was attributable to a deduction for advanced royalties which the partnership accrued as a result of a sublease of certain West Virginia coal properties prior to October 29, 1976, the prescribed effective date of a revision of the regulation.

Respondent's motion for reconsideration will be denied. We shall, however, give a more extensive statement of our reasons for denying his original motion than was contained in our order of May 13, 1983.

The record on which the partial summary judgment motion was based shows that Iaeger Partners (Iaeger) is a limited partnership formed for the purpose of engaging in coal mining. The partnership was apparently formed on October 27, 1976; in any event, it is uncontested that the formation occurred before October 29, 1976. Prior to October 29, 1976, Iaeger

---

[1] All Rules references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code of 1954 as in effect during the tax year in issue, unless otherwise noted.

entered into a sublease agreement with respect to certain coal properties in West Virginia.[2]

Under the sublease agreement, Iaeger was obligated to pay a royalty of $5 for each ton of coal mined (the production royalty). Iaeger was also obligated to pay a royalty in the fixed amount of $4,530,000 (the fixed royalty or the advanced royalty). The payment of the fixed royalty was structured as follows: (1) A nonnegotiable, noninterest-bearing note in the amount of $280,000, due on or before December 15, 1976; and (2) a nonrecourse promissory note in the amount of $4,250,000, bearing interest at the rate of $1\frac{1}{2}$ percent per quarter due December 31, 1991. The $280,000 note was evidently paid on schedule out of the investments by the individuals, including petitioner, who became limited partners. Payments of the fixed royalty were subject to recoupment by Iaeger out of payments made under the production royalty agreement. The term of the sublease was "that period of time necessary for the Partnership to mine and remove the coal from the Property."

Iaeger adopted the accrual method of accounting; it chose the calendar year as its taxable year. No coal was mined by Iaeger during 1976.

About a month after Iaeger was formed, a "Private Placement Memorandum" was issued. The memorandum was dated November 28, 1976. In addition to a description of the partnership agreement and the coal mining project to be undertaken, it contained a summary of the opinion to be

---

[2]Petitioners' brief contains the following ambiguous statements:

"While the mineral lease with Annarose Securities Corp. ('ASC') was binding on Iaeger Partners prior to October 29, 1976, the partnership did not incur or accrue the advanced royalty expense until some time after petitioner and others became limited partners. This was in accord with Section III of the sublease from ASC requiring certain conditions subsequent be met prior to paying the advanced royalties being due and payable."

The record does not contain a copy of the mineral lease here referred to, but respondent's motion is supported by an affidavit which states that "Iaeger Partners entered into a sublease agreement with Annarose Securities Corporation purportedly dated October 27, 1976." We are unable to tell for certain from these ambiguous statements whether the sublease agreement was, in fact, binding on Iaeger prior to Oct. 29, 1976. But respondent has not argued otherwise, and for the purposes of this motion, as discussed in the text, *infra*, we shall view the facts from the standpoint most favorable to petitioners, the nonmoving party. We therefore assume that Iaeger was bound by the sublease prior to Oct. 29, 1976.

rendered later by the partnership's counsel with regard to the "Federal Income Tax Aspects of the Offering."[3]

The memorandum stated that:

Counsel, relying upon various factual representations described in the Tax Opinion, is of the opinion that the Partnership should be permitted to treat the Advanced Royalty under the sublease as a deduction, for Federal income tax purposes, in 1976.

Potential investors were warned, however, that—

the characterization of such payment and the timing of the deductions therefor, for Federal income tax purposes, involve complex questions of fact and law with respect to which no rulings will be sought from the Service, and for which there is no specific legislative, judicial or administrative authority. Consequently, there can be no assurance that the Service will not contest the deductibility of the Advanced Royalty, or the taxable year for the deduction therefor, for reasons which include, but are not limited to, the contention that the Partnership is engaged in a joint venture with * * * [the sublessor], the deduction of the Advanced Royalty materially distorts the Partnership's income, the Advanced Royalty constitutes a leasehold bonus or other capital cost, or a portion of the Advanced Royalty constitutes organizational or syndication costs of the Partnership that must be capitalized. If the Service does contest the deduction in full of the Advanced Royalty in 1976, there can be no assurance that the Service will not be successful in such contest.

The memorandum also noted proposed amendments to section 1.612–3(b)(3), Income Tax Regs., which, on becoming final, would forbid deductions of advanced royalties such as the one Iaeger planned to claim for 1976.[4] Potential investors were advised that:

The effective date of the proposed amendment is to be October 29, 1976 "unless the advanced royalties are required to be paid pursuant to a mineral lease which (i) was binding prior to that date upon the party who in fact pays or accrues such royalties * * * " The parties entered into the various agreements on October 27, 1976 which were memoralized [sic] in written documents as of such date. Counsel is of the opinion that the agreements of October 27, 1976 (including the sublease) were binding upon the Partnership

---

[3] The summary was based on the assumption that there would be "no changes in the facts or the law upon which such opinion is based" between the date of the memorandum and the rendering of the opinion.

[4] We express no views as to whether sec. 706(c)(2)(B) would operate to limit petitioner's participation in the loss. Cf. *Snell v. United States*, 680 F.2d 545, 548–549 (8th Cir. 1982); *Rodman v. Commissioner*, 542 F.2d 845, 856–859 (2d Cir. 1976), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; *Marriott v. Commissioner*, 73 T.C. 1129 (1980); *Moore v. Commissioner*, 70 T.C. 1024 (1978).

and, therefore, the proposed Regulation will not apply to the payment by the Partnership of its Advanced Royalty. There can be no assurance that the Internal Revenue Service will not challenge this position nor that such challenge will not be successful.

It was emphasized that: "There can be no assurance that the Internal Revenue will not contend that the proposed Regulation is applicable to the payment of the Advanced Royalty by the Partnership."

In its Partnership Return of Income for 1976, Iaeger deducted as accrued liabilities the entire amount of the advanced royalties it was obligated to pay under the two promissory notes described above, a total of $4,530,000. A deduction of $10,000 for professional fees was also claimed. No income was reported in the return; thus, the partnership reported a loss in the amount of $4,540,000.

Petitioner Paul Elkins acquired an interest as a limited partner in Iaeger in 1976, on or after November 29 of that year. Under the terms of the acquisition, he became entitled to 0.855 percent of the partnership profits and losses. Accordingly, petitioners claimed a deduction in the amount of $38,817 as their distributive share of Iaeger's loss for 1976 in their own joint Federal income tax return for that year. Respondent denied this deduction in its entirety on the ground, among others,[5] that a 1977 amendment to section 1.612–3(b)(3), Income Tax Regs., operated retroactively to invalidate the deduction of the advanced royalties. Several other adjustments were made to petitioners' return, but respondent's motion for partial summary judgment involved only the Iaeger deduction, and that only to the extent that it was attributable to the

---

[5]The notice of deficiency disallowed petitioner's claimed Iaeger partnership loss on the additional grounds that petitioner had failed to show (1) that the transactions and expenditures ever occurred in fact or in substance; (2) that the venture was a trade or business; (3) that the underlying events arose in a trade or business or in a transaction entered into for profit; (4) that the amounts deducted as royalties were paid or accrued pursuant to an agreement that was binding prior to Oct. 29, 1976; (5) that the claimed loss exceeded petitioner's adjusted basis; and (6) that any nonrecourse financing should be considered in determining petitioner's adjusted basis in the partnership or in determining the adjusted basis of the partnership's assets. The motion for partial summary judgment deals with none of these grounds. To the extent that any of those factors have a bearing on the partial summary judgment, it will be assumed, but not decided, that respondent's determinations with respect to them were erroneous. *Jacklin v. Commissioner*, 79 T.C. 340, 344 (1982).

deduction claimed by the partnership for the accrual of advanced royalties in the amount of $4,530,000.

Rule 121(b) provides that a decision may be rendered on a motion for summary judgment if it is shown "that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." The Rule further provides that "partial summary adjudication may be made which does not dispose of all the issues in the case." The factual materials presented and the inferences to be drawn therefrom "must be viewed in the light most favorable to the party opposing the motion." *Jacklin v. Commissioner*, 79 T.C. 340, 344 (1982).

Accordingly, for the purposes of respondent's motion, the Court assumed, but did not decide, that Iaeger Partners was a valid partnership; that it was in the business of subleasing and mining coal; and that, prior to October 29, 1976, Iaeger entered into a bona fide sublease obligating Iaeger to pay an advance royalty of $4,530,000 by means of a valid $4,250,000 nonrecourse note and a $280,000 promissory note. The Court further assumed, without deciding, that prior to October 29, 1976, Richard Siegal was the only general partner and John Spooner was the only limited partner. Finally, the Court assumed that petitioner and certain other individuals acquired limited partnership interests on dates between October 29, 1976, and the end of the year.

Section 1.612–3(b)(3), Income Tax Regs., as it stood prior to the amendment discussed below, allowed the "payor" of "advanced royalties," at his option, to treat the royalties paid or accrued in connection with mineral property either—

(i) As deductions from gross income for the year the advanced royalties are paid or accrued, or

(ii) As deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, is sold.

Petitioners contend that the quoted portion of the regulation applies to their case, and that the partnership made a valid election under subdivision (i) to deduct the advanced royalties in the year that they were accrued.[6]

---

[6]See also Rev. Rul. 70–20, 1970–1 C.B. 144, and Rev. Rul. 74–214, 1974–1 C.B. 148. In both rulings, which have since been revoked, respondent concluded that lump-sum royalties were deductible when paid or accrued.

Proposed amendments to the regulation were announced by the Internal Revenue Service on October 29, 1976, with the issuance of News Release IR-1687. The amendments were published in the Federal Register on November 2, 1976. 41 Fed. Reg. 48133 (1976). The final version of the amended regulation was published on December 19, 1977, in T.D. 7523, 1978-1 C.B. 192[7] (42 Fed. Reg. 63640), and, apart from its effective date, insofar as it affected the deduction herein concerned, was substantially the same as the version published in News Release IR-1687, and in the Federal Register. The operative provision of the revised regulation provides for the accrual of advanced royalties by the "payor" in the year in which the mineral product is sold, as follows:

(3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists). * * * For additional rules relating to elections in the case of partners and partnerships, see section 703(b) and the regulations thereunder. * * * [8]

When the proposed amendment was first announced on October 29, 1976, IR-1687 stated that the amendment would not apply to royalties required to be paid pursuant to a mineral lease which was "binding prior to that date upon the party who in fact pays or accrues such royalties."[9] An identical statement was included in the Federal Register when the proposed amendment was published there. Under this effec-

---

[7] On the same day, the Internal Revenue Service issued Rev. Rul. 77-489, 1977-2 C.B. 177, revoking Rev. Ruls. 70-20 and 74-214, cited in note 6 *supra.*

[8] The validity and retroactive application of this portion of the regulation to Oct. 29, 1976, have been sustained in *Wendland v. Commissioner,* 79 T.C. 355, 379-385 (1982), on appeal (9th Cir. and 11th Cir., June 8, 1983), and *Wing v. Commissioner,* 81 T.C. 17 (1983).

[9] The statement in IR-1687 on the effective date of the regulation is as follows:

"Under the proposed amendment, the treatment of advanced royalties would be revised, effective October 29, 1976, unless the advanced royalties are required to be paid pursuant to a mineral lease which (i) was binding prior to that date upon the party who in fact pays or accrues such royalties, or (ii) was required, pursuant to a written contract, to be executed by the party who in fact pays or accrues such royalties, provided that such party establishes, to the satisfaction of the Secretary or his delegate, that under all the facts and circumstances the contract was binding upon such party prior to that date. For purposes of clause (ii) above, a contract will in no event be considered to be binding upon such party if the obligations imposed on such party prior to October 29, 1976 were not substantial or were illusory."

tive date provision, Iaeger would have been entitled to accrue and deduct the advanced royalties in its tax return for 1976 because it was bound to pay them prior to October 29, 1976, and, in fact, accrued them. Petitioner, in turn, would have been entitled to deduct his distributive share of the partnership loss produced mainly by the royalty deduction.

When the amendment was made final in December 1977, the Treasury Department promulgated the operative provision of the regulation as such in substantially the form in which it was proposed but changed the effective date provisions to read as follows:

the amendment will not apply if prior to October 29, 1976 (i) the payment of the advanced royalties was required pursuant to a mineral lease which was binding upon the party who in fact pays or accrues such royalties, * * *

In the case of advanced royalties paid or accrued by a partnership the "party" who, under the preceding paragraph, must be obligated prior to October 29, 1976, with respect to the payment of the advanced royalties is the partner, not the partnership. For purposes of the preceding sentence a partner is considered obligated prior to October 29, 1976 if the partnership was obligated immediately prior to that date and then only to the extent of the partner's distributive share of the partnership's liability for such payment immediately prior to that date. * * * [T.D. 7523, 1978–1 C.B. 192, 193–194 (42 Fed. Reg. 63640).]

IR-1687's effective date provisions, referred to above, in contrast, had not separately defined the term "party" but had keyed the regulation's October 29, 1976, effective date to royalties "required * * * pursuant to a mineral lease * * * binding * * * upon the party who in fact pays or accrues such royalties."

As noted above, Iaeger entered into the sublease before October 29, 1976, but petitioner did not acquire his partnership interest until after the October 29, 1976, cutoff date had passed. Relying on the definition of the term "party" contained in the effective date provisions of T.D. 7523, respondent argues that, because petitioner was not a member of the partnership on the crucial date, the amended regulation forbids petitioner any deduction of advanced royalties for 1976 except to the extent of production. Because Iaeger produced no coal in 1976, respondent concludes that petitioner may claim no deduction for advanced royalties accrued in that year.

Petitioners argue that the partnership rather than the partner must be considered "the party who in fact pays or

accrues such royalties" and on whom the lease was "binding" prior to October 29, 1976. From this premise, they argue that their case is controlled by the old law because Iaeger was obligated to pay the royalties prior to the cutoff date. It follows, the argument goes, that petitioners are entitled to a deduction for their distributive share of the partnership loss, generated by the deduction of the advanced royalties.

We consider petitioners' interpretation of the term "party" as used in the announcement of the proposed regulation by far the more reasonable one. In the context of this case, so far as its facts have been made known to us, we do not think that respondent's interpretation of the term to mean the individual limited partner, rather than the partnership, can be sustained. We think the October 29, 1976, announcement clearly indicated that a partnership, such as Iaeger, which was bound on a mineral lease prior to that date, would be entitled to accrue the advanced royalties for which it was obligated. In such circumstances, the partners would be entitled to deduct their distributive shares of a partnership loss produced by the deduction. We think that the Secretary, having made that announcement, was required to abide by its terms, at least in his dealings with taxpayers who had acted in reasonable reliance on it.[10]

The operative provisions of both the old and new versions of the regulation address the timing of deductions for advanced royalties by the "payor" of such royalties. In the instant case, Iaeger, rather than the individual partners, was the "payor" of the royalties within the plain language of those operative provisions. Those provisions cannot be interpreted to mean that petitioner as a limited partner in Iaeger was a "payor" of the royalties.

The effective date of the regulation as explained in IR-1687 is entirely consistent with the foregoing interpretation of the operative provisions. They state that the new regulation will

---

[10]Compare this Court's remarks in *Presbyterian & Reformed Pub. Co. v. Commissioner,* 79 T.C. 1070, 1089 (1982), on appeal (3d Cir., July 6, 1983), concerning the retroactive revocation of the tax-exempt status of a sec. 501(c)(3) organization:

"Where * * * the Commissioner has chosen, in the exercise of his wide discretion, to impose discretionary limits, he must abide by those limits. See *Lansons, Inc. v. Commissioner,* 622 F.2d 774, 778 (5th Cir. 1980), affg. 69 T.C. 773 (1978); cf. *Pittsburgh Press Club v. United States,* 615 F.2d 600, 606 (3d Cir. 1980). * * * "

not apply if, prior to October 29, 1976, the payment of the advanced royalties was required pursuant to a mineral lease "which was binding \* \* \* upon the party who in fact pays or accrues such royalties." The "party who in fact pays or accrues such royalties" is, in substance, the same party as the "payor" referred to in the operative provisions of the regulation. Just as the individual limited partner could not be considered the "payor" under the operative provisions, neither could he be the "party who in fact pays or accrues such royalties" in the words of the effective date provisions. Neither, as we shall discuss, could the sublease be "binding" on a limited partner. Iaeger was, instead, the party who was bound and who in fact paid or accrued the royalties.

Respondent's interpretation of the term "party" is also inconsistent with the whole scheme of partnership taxation.[11] The choice of an accounting method, and hence the timing of the deduction of royalties, such as the ones in question, is an election made by the partnership, not by each partner separately. Sec. 703(b).[12] Indeed, the text of the operative provision of the revised regulation specifically directs attention to the section 703(b) elections. A partner as such has no distributive share of advanced royalties, as the T.D. 7523 effective date provisions seem to contemplate. Section 702 calls for the deduction of royalties by the partnership and the determination at the partnership level of partnership taxable income or loss. Distributive shares of the partnership's income

---

[11]Sec. 761(a) authorizes the Secretary to issue regulations under which the members of certain unincorporated organizations may elect to exclude those organizations from the application of all or part of the partnership tax provisions of subch. K. Those regulations appear at sec. 1.761–2, Income Tax Regs. Such an election was in effect, for example, in the *Wing* case. *Wing v. Commissioner, supra* at 19. In the present case, however, the record contains no indication that an election under sec. 761(a) was in effect with respect to Iaeger.

[12]As in effect for the year in question, sec. 703(b) provided as follows:

SEC. 703(b). ELECTIONS OF THE PARTNERSHIP.—Any election affecting the computation of taxable income derived from a partnership shall be made by the partnership, except that the election under section 901, relating to taxes of foreign countries and possessions of the United States, and any election under section 615 (relating to pre-1970 exploration expenditures), under section 617 (relating to deduction and recapture of certain mining exploration expenditures), under section 57(c) (relating to definition of net lease), or under section 163(d) (relating to limitation on interest on investment indebtedness), shall be made by each partner separately.

or loss are then taken into account by the individual partners.[13] Moreover, when a question arises whether the activity engaged in by the partnership constitutes a trade or business carried on for profit, a prerequisite for section 162(a)(3) advanced royalty deductions, that determination, too, is made at the partnership level. *Surloff v. Commissioner*, 81 T.C. 210 (1983); *Brannen v. Commissioner*, 78 T.C. 471, 505 (1982), on appeal (11th Cir., Aug. 23, 1982).

Finally, respondent's interpretation of the term "party" is inconsistent with the legal status of investors in a limited partnership like the one involved in this case. Because limited partners as such are not bound by the obligations of a partnership beyond their capital contributions, they would be neither bound nor obligated by the partnership's mineral lease or sublease.[14] Indeed, it is difficult to conceive the circumstances in which a limited partner would, in fact, pay or accrue the royalties, be bound or obligated by a lease, or (except in case of a sec. 761(a) election) have a distributive share of a deduction for advanced royalties. The conclusion that the clause, "party who in fact pays or accrues such royalties," referred to the individual partners would, therefore, be even more far-fetched in the case of a limited partnership like the one here concerned than in the case of one having only general partners.[15]

We must, then, consider what effect the announced provisions of the proposed regulation had on the Secretary's

---

[13]Some items are required by sec. 702(a)(1) through (7) to be separately stated, but deductions for royalties such as the ones here in question are not among those items, nor has any reported decision held them to be required to be separately stated under the "catchall" provision of sec. 1.702–1(a)(8)(ii), Income Tax Regs.

[14]Sec. 1 of the Uniform Limited Partnership Act (ULPA) provides:

"A limited partnership is a partnership formed by two or more persons * * * having as members one or more general partners and one or more limited partners. The limited partners as such shall not be bound by the obligations of the partnership."

Sec. 7 of the ULPA qualifies that broad statement as follows:

"A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business."

There is no evidence that petitioner had anything to do with the operation of Iaeger's business.

[15]We limit our conclusion to the case of limited partners and, despite reservations, express no views with respect to the effect of the provision on the claims of general partners.

discretion later to make retroactive changes in the regulation when adopted. Section 7805(b)[16] grants the Secretary the power to prescribe the extent to which regulations shall be applied without retroactive effect. It is well settled that the Secretary's action in this regard is reviewable for an abuse of discretion. *Automobile Club v. Commissioner*, 353 U.S. 180, 184 (1957). This Court has commented, however, that—

> his discretion generally will be upheld unless there is evidence of unconscionable injury or undue hardship suffered by the taxpayer through reliance on the erroneous position (see, e.g., *Schuster v. Commissioner, supra*; *Lesavoy Foundation v. Commissioner*, 238 F.2d 589 (3d Cir. 1956)); or the circumstances reveal an unfair disparity in the Commissioner's treatment of similarly situated taxpayers (see, e.g., *Farmers' & Merchants' Bank v. United States*, 476 F.2d 406 (4th Cir. 1973); *International Business Machines Corp. v. United States*, 170 Ct. Cl. 357, 343 F.2d 914 (1965)); or other unusual circumstances are present. [*Manocchio v. Commissioner*, 78 T.C. 989, 1001 (1982), affd. 710 F.2d 1400 (9th Cir. 1983).]

The retroactive application of the particular regulation concerned in this case was considered and approved by this Court in *Wendland v. Commissioner*, 79 T.C. 355 (1982), on appeal (9th Cir. and 11th Cir., June 8, 1983), and in *Wing v. Commissioner*, 81 T.C. 17 (1983). Those cases, however, did not involve an investor in a partnership which had been formed and had become obligated to pay advanced royalties before October 29, 1976, the effective date of the new regulation.[17] This case, therefore, involves a factor not present in either *Wendland* or *Wing*. Although petitioner did not become a partner until after the effective date of the new regulation, Iaeger was formed and became obligated to pay the advanced royalties prior to that date. Under the announced effective date of the proposed regulation, Iaeger could accrue the disputed royalties and a partner could deduct his distributive share of the loss generated thereby. Under the Treasury

---

[16]SEC. 7805. RULES AND REGULATIONS.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

[17]The partnership involved in *Wendland v. Commissioner*, 79 T.C. 355, 359 (1982), on appeal (9th Cir. and 11th Cir., June 8, 1983), was formed on Dec. 30, 1976. In *Wing v. Commissioner*, 81 T.C. 17, 19 (1983), a joint operating agreement and a mining sublease were signed on Oct. 8, 1977.

Decision adopted 14 months later, in December 1977, a partner could not do so unless he was a member of the partnership on October 29, 1976.

The Secretary's discretion to apply his regulations retroactively is very broad, but its counterpart is the responsibility to provide taxpayers with adequate guidance as to the extent to which his power will be exercised, or at the very least to avoid misleading them. This he has not done in the present case. We think that it was unreasonable of the Secretary to require taxpayers to divine his meaning in using the word "payor" and the clause "party who in fact pays or accrues such royalties" without informing them prior to their investment that the words did not mean what they said.[18] We think that it would constitute an abuse of discretion for respondent first to state a concise rule through the medium of an official pronouncement[19] and then belatedly to alter that rule to the substantial disadvantage of a taxpayer who had meanwhile acted in reliance on the most reasonable interpretation of it.[20]

Summary judgment under Rule 121 is appropriate if the record shows that "there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." In the circumstances of the present case, however, it remains uncertain to what extent petitioner actually relied on respondent's statements prior to his investment in the partnership to the effect that royalties paid or accrued pursuant to an agreement binding prior to October 29, 1976, on "the party"

---

[18]Indeed, in view of the popularity of the limited partnership as an investment vehicle for tax shelters of the sort that the new regulation was obviously intended to attack, it might have been expected that special attention would have been timely given to explaining the new regulation's effect on limited partners. Compare 5 U.S.C. sec. 553(b), (c), and (d), the notice provisions of the Administrative Procedure Act, as applied in *Am. Standard, Inc. v. United States*, 220 Ct. Cl. 411, 427–429, 602 F.2d 256, 267–268 (1979).

[19]Respondent is, of course, not estopped by erroneous advice given by his individual agents.

[20]We note that the Commissioner "is empowered retroactively to correct mistakes of law * * * even where a taxpayer may have relied to his detriment on the Commissioner's mistake." *Dixon v. United States*, 381 U.S. 68, 72–73 (1965). This case, however, does not involve the correction of a mistake of law. It concerns, instead, the purely administrative matter of when a new regulation is to take effect. *Dixon*, therefore, does not obviate a consideration of the extent of petitioner's reliance on respondent's statements in IR-1687 and the Federal Register. See *Schuster v. Commissioner*, 312 F.2d 311, 317 (9th Cir. 1962), affg. 32 T.C. 998 (1959), and revg. 32 T.C. 1017 (1959), recognizing a distinction between the Commissioner's power to correct mistakes of law and to act in "matters of a purely administrative nature."

who paid the royalties would continue to be governed by the old regulation. Petitioner argues that he relied on the public announcement, and the prospectus, quoted in part above, specifically refers to the October 29, 1976, cutoff date. Respondent maintains that petitioner has not shown that he relied on the IR–1687 announcement. It is, therefore, still to be decided whether petitioner suffered injury or undue hardship through reliance on respondent's statement.[21] Accordingly, respondent's motion for reconsideration of the denial of the motion for summary judgment cannot be granted.[22]

*An appropriate order will be entered.*

---

[21]In arguing that petitioner did not rely on his interpretation of the term "party," respondent pointed out that the offering prospectus is "replete with warnings that the Service may challenge this, that they may not be entitled to the deductions." These "warnings," however, are either very general or concern other issues such as the danger that the royalty agreements will be found not to have been binding on the *partnership* as of Oct. 29, 1976. See note 2 *supra*. Nowhere in the prospectus is it speculated that the Commissioner, when referring to the "party" required to be bound, might.have meant the individual partner rather than the partnership. Accordingly, we do not consider the question of petitioner's reliance on respondent's statements in IR-1687 and in the Federal Register to have been foreclosed by the "warnings" in the prospectus.

By deciding the case on the narrow ground of reliance, we do not intend to hold that the effective date provisions are valid. We express no view as to whether, in the light of the statutory scheme for taxing partnership income, a limited partner who as a matter of law would, in no circumstances, become "obligated" on a lease or have a "distributive share of the partnership's liability" for the payment of advance royalties, can be treated by the effective date provision of the regulation as if he were so obligated and had such a distributive share.

[22]Petitioner argued that respondent's motion must be denied for the additional reason that the deduction for advanced royalties was claimed under sec. 162 and may not be denied pursuant to a regulation under sec. 612. This argument is without merit. *Wendland* and *Wing* make it clear that deductions for advanced royalties may be denied pursuant to a proper application of the regulations under sec. 612.